UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RONALD MCMAHAN,

Plaintiff,

v.                                                CAUSE NO. 3:25-CV-220-CCB-SJF

WILLIAM WILSON, et al.,

Defendants.

## OPINION AND ORDER

Ronald McMahan, a prisoner without a lawyer, moves for a preliminary injunction requiring that he be given mental health treatment and/or transferred out of long-term segregation at Westville Correctional Facility ("Westville"). (ECF 3.) The court ordered a response from the Warden of Westville, which has now been filed.[1] (ECF 16.)

## BACKGROUND

McMahan is an inmate in the long-term segregation unit at Westville, called the Westville Control Unit ("WCU"). He asserts that he is not receiving adequate treatment to address mental health problems and suicidal ideations. (ECF 6.) He was granted leave to proceed on a claim against the Warden in his official capacity for injunctive

---

[1] By operation of the Local Rules, any reply by McMahan was due May 12, 2025. N.D. Ind. L.R. 7-1(d)(2)(B). That deadline has now passed.

relief related to his need for mental health treatment and protection from self-harm.[2]
(*Id*.)

The Warden has submitted 375 pages of medical records and other documents in response to the motion. (ECF 16.) Those records reflect that McMahan has been in the custody of the Indiana Department of Correction since 2015, and was transferred to WCU from another facility in October 2023. (ECF 16-2.) When he arrived at WCU, he had no previously diagnosed mental health conditions. (ECF 16-3 at 2.) Nevertheless, in accordance with procedure, a mental health provider performed an intake assessment, which included conducting a suicide risk assessment and mental health screening. (*Id.* at 1-11.) McMahan completed a detailed mental health questionnaire and denied feeling depressed or having other mental health concerns. (*Id.* at 8.) He also denied any mental health concerns when he spoke with the provider. (*Id.* at 2.) The provider determined that his mental health, thought processes, cognition, and mood were all within normal limits and that he was not at risk of suicide. (*Id.* at 2-11.) He was classified with a mental health code of "A," meaning he had no mental health conditions. (ECF 16-4.)

As with all inmates in long-term segregation, McMahan receives regular mental health rounds, known as "cell-front" visits, with mental health professionals. (ECF 16-8.) Records reflect that those visits have occurred every few weeks beginning with his arrival at WCU in October 2023. (*Id.*; ECF 16-10; ECF 16-11; ECF 16-13; ECF 16-15.)

---

[2] He was also granted leave to proceed on a claim for damages against several prison employees for damages for denying him sanitary conditions of confinement in violation of the Eighth Amendment. He did not seek emergency injunctive relief related to that claim nor did the court order the Warden to respond to that issue. (*See* ECF 4 at 10-14.)

Between October 2023 and July 2024, McMahan did not report any mental health concerns, nor did the providers assessing him discern any such concerns. (ECF 16-8 at 1-114.)

On July 23, 2024, McMahan had a cell-front visit with a psychologist, who was speaking with inmates because another inmate in the unit had committed suicide earlier that day. (ECF 16-10 at 7.) McMahan reported to the psychologist that he felt "fucked up" and wanted to return to general population. (*Id.*) But she also noted that he was laughing and joking during their visit. (*Id.*) He inquired about how he could be designated as Seriously Mental Ill ("SMI"), a classification used by IDOC to delineate inmates with chronic mental health conditions.[3] (*See id.*) She reported that he said he was "hearing and seeing things" and had "killed ten people," but then said, "I was just playing . . . [d]on't write that down." (*Id.*) He did not endorse any suicidal ideations. (*Id.*) He asked her to pass along to staff responsible for placement decisions that he felt ready to transfer out of WCU, and she agreed to pass along that information. (*Id.*)

Regular cell-front visits continued after this visit. From August 14, 2024, through February 5, 2025, McMahan did not report any mental health concerns, nor did mental health providers evaluating him discern any such concerns. (ECF 16-11 at 1-76.) During this period, McMahan also had a routine medical visit and did not voice any mental health concerns during the visit. (ECF 16-12.)

---

[3] Under IDOC policy, inmates with an SMI classification generally are not housed in restrictive housing for lengthy periods unless specific criteria are met. (*See* ECF 16-19.)

3

In February 2025, McMahan began to report feeling depressed. During a cell-front visit on February 5, McMahan reported that he was "seeing things" and requested to have an in-person therapy session. (ECF 16-13 at 8.) He did not report any thoughts of suicide. (*Id.*) He was placed on the list for an available in-person therapy session. (*Id.*)

He submitted another request approximately one week later, stating that he was depressed and needed a therapy appointment. (ECF 16-14 at 1.) He stated that his "mind [was] wandering bad" and he "just need[ed] to speak with someone." (*Id.*) He did not report any thoughts of suicide. (*Id.*) A staff member responded and informed him that he was on the list to be seen. Three days later, McMahan submitted another healthcare request stating that he was still feeling depressed and would like to speak to someone. (*Id.* at 2.) He did not report any thoughts of suicide. (*Id.*) A staff member responded to his request and told him that he was on the list but that the department was short-staffed at that time. (*Id.*) She asked him to "please be patient." (*Id.*) The following day, McMahan submitted another request to see a therapist. (*Id.* at 3.) He did not report any thoughts of suicide. (*Id.*) He summitted two more healthcare requests on February 23 and February 26, stating that he was depressed and no one had come to talk to him. (*Id.*) He did not report any thoughts of suicide. (*Id.*) On February 28, a staff member responded to all three requests. She told him he was on the list to be seen, but because of limited staff they were "behind." (*Id.*) On March 2, McMahan submitted another healthcare request asking for a therapy session. (*Id.*) He did not report any thoughts of suicide. (*Id.*) A staff member responded on March 5 and told him he was scheduled for an in-person therapy session the following week. (*Id.*)

On March 3, in the midst of these communications, McMahan filed his complaint and motion for preliminary injunction, claiming that his mental health needs were not being adequately addressed by staff at WCU. (ECF 1, 3.)

McMahan was evaluated during cell-front visits on March 5 and March 11. (ECF 16-15.) He told the providers who met with him that he was feeling depressed because he was not with his family. (*Id.* at 8-9.) He did not report any thoughts of suicide at those visits. (*Id.*) The mental health providers who assessed him on those dates reported "[n]o immediate [mental health] concerns" and "[n]othing remarkable to report." (*Id.*)

On March 13, McMahan was seen by a therapist. (ECF 16-16 at 1.) He reported that he had started experiencing depressive symptoms during the past year after his grandmother died. (*Id.*) He reported that he often isolated himself and felt like there was "no hope at all." (*Id.*) However, he denied thoughts of suicide or self-harm. (*Id.*) He and the therapist discussed coping strategies, such as utilizing his support system (which McMahan characterized as "good") or listening to music to relieve stress. (*Id.*) The therapist reported that McMahan appeared receptive to his advice about coping mechanisms. (*Id.*) In the therapist's view, McMahan did not appear to be in distress or displaying any concerning behaviors. (*Id.*) His mood, thought-processes, judgment, and cognition were all assessed as normal. (*Id.*) The therapist ordered a follow-up visit in two weeks. (*Id.*)

Four days after this visit, McMahan submitted another healthcare request. (ECF 16-14 at 7.) He stated that he was depressed and needed another appointment as soon as possible. (*Id.*) He did not report any thoughts of suicide. (*Id.*) A staff member

responded and told him that he would be scheduled. (*Id.*) A few days later, McMahan submitted another healthcare request stating that he needed to talk to someone and that he was "starting not to be able to take it anymore." (*Id.*) A staff member responded and told him he had another appointment scheduled and directed him to use the coping skills he had discussed with the therapist. (*Id.*)

On April 29, McMahan had a second in-person therapy session.[4] (ECF 16-17.) The therapist reported that McMahan appeared with a "low mood." (*Id.*) The therapist asked him whether he had been using his coping skills, and he responded, "[T]hose pissed me off." (*Id.*) The therapist assisted McMahan in processing his thoughts and feelings. (*Id.*) He reported ruminating about past mistakes and missing his family. (*Id.*) He discussed feelings that he did not want to be in WCU. (*Id.*) When asked about any feelings or thoughts related to suicide or self-harm, McMahan stated that he experienced passive suicidal ideations without a specific plan or intent. (*Id.*) He explained, "It['s] just a thought, like if I wasn't here, I wouldn't do anything, but I don't want it to get to that point." (*Id.*) The therapist determined that placing McMahan on suicide watch was not clinically indicated at that time because McMahan assured the therapist he had no intent to commit suicide. Additionally, McMahan expressed hopes and plans for the future, including spending time with family upon his release from prison. (*Id.*) He denied any hallucinations, and the therapist assessed his thought

---

[4] The Warden states in his supporting brief that this visit occurred on March 29, 2025. (ECF 16 at 15, 17.) However, the record of that visit indicates in several places that the visit occurred on April 29, 2025. (ECF 16-17 at 1-3.) The court presumes this was simply a scriveners' error by the Warden.

processes, judgment, and cognition as normal. (*Id.* at 2-3.) She changed his mental health code to "C," adding a diagnosis of Major Depressive Disorder to his chart. She referred him to psychiatry staff for additional evaluation and treatment. (*Id.*)

It appears that as of the filing of the Warden's response in early May 2025, McMahan was awaiting his consultation with psychiatry staff. In the interim, he continues to have regular cell-front visits, and if he were to communicate or present any behaviors that indicated suicidal ideation, a detailed suicide prevention plan would go into effect to protect him from self-harm. (ECF 16-2 ¶¶ 26-27; ECF 16-19; ECF 16-20.)

## ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all

reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes appropriate measures to address the risk of self-harm from suicide. *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021). To prove a violation of this right, a prisoner must show (1) he had an objectively serious medical need and (2) the defendant acted with deliberate

8

indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

On the second prong, deliberate indifference represents a high standard. "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to prove an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Instead, the inmate must demonstrate "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. The court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). In effect, the Eighth Amendment protects prisoners from "grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019).

The records before the court reflect that McMahan did not have a mental health condition when he arrived at WCU but recently developed depression due to the death of a loved one and other situational factors. Since raising concerns about his mental health, McMahan had two in-person therapy sessions, received a diagnosis of Major

Depressive Disorder, and was referred to psychiatry staff for additional evaluation and treatment. The court understands that the process did not proceed as quickly as McMahan would have liked, and that he was told he would have a follow-up visit in two weeks but was not seen for almost six weeks. Nevertheless, the court considers that the delay was not overly long and that it appears to have been caused by short-staffing, not a lack of concern for McMahan's problems. With limited resources available, staff appeared to be triaging McMahan's needs along with those of other prisoners in long-term segregation. McMahan was monitored by mental health providers conducting cell-front visits during this period, and they did not find any immediate concern warranting suicide watch or other forms of emergency intervention. Their professional opinion is entitled to deference in this proceeding. *Walker*, 940 F.3d at 965. His own subjective assessment of his medical needs or disagreement with mental health providers does not establish an Eighth Amendment violation. *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019).

McMahan makes a general request for some unspecified form of treatment, but the court considers that he filed his motion for a preliminary injunction before his therapy sessions occurred and he was referred to a psychiatrist. Based on the present record, McMahan has not demonstrated a likelihood of success in proving that medical staff are acting with deliberate indifference to his mental health needs.

To the extent he is asking the court to order his immediate release from WCU because of mental health concerns, the court must consider that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and

10

execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Prisoners do not have a constitutional right to the housing assignment of their choice, and where best to house a prisoner is generally a matter that is committed to the discretion of prison officials. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996).

The court does not doubt that the conditions in long-term segregation are unpleasant. However, the record reflects that McMahan's mental health needs are being monitored and assessed on an ongoing basis while he is in long-term segregation. Based on the concerns he presented to mental health staff, he has been diagnosed with a mental health condition and will be receiving additional evaluation by a psychiatrist. In the interim, he will continue to be monitored by mental health staff, and if he were to communicate or present any behaviors that indicated a risk of suicide, a detailed suicide prevention plan would be put into place. (ECF 16-2 ¶ 26; ECF 16-19; ECF 16-20.) In light of the present record, McMahan has not demonstrated an entitlement to the extraordinary remedy of a preliminary injunction.

For these reasons, the plaintiff's motion for a preliminary injunction (ECF 3) is **DENIED**.

SO ORDERED on May 20, 2025.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT